May it please the Court, my name is Mark Taylor. I'm here today on behalf of the appellants in this case. We believe that in this case there are two central issues and that is whether or not the appellants had standing below to bring the claims, whether or not they had the ability to sue on the fidelity bond that they acquired. And secondly, though addressed only in passing by the district court below, mentioned but not really decided upon, whether or not there was a direct loss such that anyone's rights under the fidelity bond would have accrued to begin with. First of all, with respect to the standing issue, there's a lot of discussion in the briefs and in the court below about the effect of the collateral assignment initially under the indenture. As the Court may recall, when the collateral assignment was granted, the collateral assignment, what does that mean? What is collateral assignment? Collateral assignment means you grant... That's not an expression that I'm well-acquainted with. If you want to say assignment of collateral. Assignment of collateral. That's the proper term. It is. And that's just probably our shorthand way that we use in our courts in Texas and call it a collateral assignment, meaning an assignment of collateral. It's a grant of a security interest, a grant of a lien, Your Honor. There's a lot of discussion about that, which I think... I'm not sure I understand why that's a separate category here, but go ahead. Well, basically because there are, there's an outright assignment, which would be an actual transfer of title, and there's the rights that you can assign to someone as a secured party in collateral, where they have essentially equitable rights in the collateral that you're assigning them a lien upon, as opposed to an actual legal transfer of legal title. And that's really the distinction. Well, they're all equitable. That's pretty basic. Pardon me? These rights are all equitable. They are akin to rights in equity, as opposed to a legal transfer of title. They're equitable. Go ahead. They may be. The collateral assignment of rights may be purely an equitable right. It is a right that you have in the collateral if certain things happen. And what I was trying to get to was I think we can avoid most of that, because there was actually an actual transfer of title that occurred in this case. Counsel, let me get to the heart of my problem with your case. What this was, was a And I think you have to show that there was loss to travelers, and we never get there, do we? That's right. And that's the issue. Yes, Your Honor, and I agree. And that's the issue that, for whatever reason, the district court below mentioned, but didn't address in either one of its rulings, but certainly this court can address, because I believe certainly if you can decide it as a matter of law, you can decide it on that basis. But there was, in fact, a direct loss to travelers in this case that would give rise to a claim on the fidelity bond under the Vons case from the circuit, and the Lynch case. What was travelers' loss? Travelers' loss is that they now have to make double payments under the note to the Class A note holders. What happened in this case is that because the default wasn't properly noticed, it wasn't properly declared, because it was hidden, essentially, by the servicer continued to make payments to both the Class A note holders and the Class B note holders. If the default had been properly noticed under the waterfall and the indenture, the payments to the Class B note holders would have stopped, and all of the payments would have gone to the Class A note holders. As a result of the servicer's failure to properly note the defaults and to properly make the payments, the Class B note holders received $1.4 million that they should not have received. Now, the bond protects travelers against dishonesty of its own employees, correct? It does, but Rider 2 also includes the servicer. If you look at Rider 2 to the bond, and it says that it also ensures any of the servicers of the contracts. The servicer defaulted, but the loss was travelers, right? The servicer was the one who had the employee who committed the defaultation. Both are insured parties under the bond. The original name insured on the bond is travelers. The default was a failure to report this situation, right? The default was a failure to report a number of things that are set forth, or that we believe are set forth in the summary judgment evidence below. It was a delinquency in payments under the contracts, default rates under the contracts, and a failure of the tangible net worth requirement of travelers' acceptance court under the transaction documents. None of those defaults were properly noted, and all of them resulted in improper payments. Now, does the, under the terms of the bond, could it be assigned without the consent of the insurance company? The bond itself says that only the named insured can bring a suit under the bond, and California law that we've cited in our brief, we believe makes it clear that an anti-assignment provision is ineffective to prevent an assignment of rights, at least under an insurance policy, and that's really what the cases go to, once the loss has occurred. Well, isn't that, aren't they talking about an assignment of proceeds rather than an assignment of the right to bring a claim? Those are two very distinct rights under a policy. Actually the case law that we've cited in our brief specifically talk about the rights to sue, and in particular the Hinkle case that's cited in our brief from California specifically says that clauses limiting assignments of rights to sue under insurance policies are ineffective once that transfer, once the assignment takes place after the loss has occurred. Let me ask this. Do you have any cases on bonds, on fidelity bonds? The cases that deal with fidelity bonds are the cases that deal with the direct loss requirements. The cases that talk about whether you can transfer a fidelity bond, I was unable to find any. I didn't find any. I couldn't find any in Cal, looked at all the jurisdictions that could possibly have an interest in this, California, New York, Pennsylvania, which is National Union's home state, and none of them, in none of those states could we find any case law that dealt with fidelity bonds and assignments of fidelity bonds. Now, did travelers, since it didn't bring a claim under the bond, by the terms of the bond, it wouldn't at this point bring a claim? No, the indentured trustee, well now if travelers is the only party that could bring a claim, that deadline would have passed. That's what I asked. The notice of loss itself that was given by the trustee and the lawsuit were both brought within the time limits required by the fidelity bond. So the issue is, do they have the right to do it? But travelers didn't do it. Travelers didn't do it, and we believe that part of the reason is, is that all of these are a common parent company, Finantra, and they're not going to tell on each other is really what it amounts to. It's one big happy family, and therefore the indentured trustee was the party that had to step in and take care of it. But what are the underlying transactions that are being financed here? The underlying, there were consumer notes, consumer loans, anything from car loans to health club memberships, and they were securitized and the notes were issued, but the underlying, the ultimate underlying contracts that form the basis for the transaction were consumer loan transactions, and then they were securitized and turned into notes and placed in the indenture. I wanted to address one issue on the, I'm sorry, go ahead. Before you get to that, you were making the argument that this was one big happy family. There are, however, separate entities, and is there any assertion that they're separate characters should not be respected for reasons of piercing the corporate veil, etc., or shall we view them as separate entities even though related? We have not made any assertion of alter ego liability, Your Honor. Okay. So for our purposes, even though they're related, and it may explain some motivations, they are separate entities. Yes, they're separate entities. Whether they're alter ego claims, I don't know. I know that financial, but aside. But they're not in front of us now, are they, or are you? No. Okay. No, Your Honor. On the direct loss issue that you were mentioning earlier, Justice Fletcher, I think if you look at the, this Court's opinion in bonds relies heavily on the Fifth Circuit's opinion in the Lynch case. And what the Fifth Circuit said in Lynch is that the distinction on whether or not there's a direct loss is whether or not the loss was caused to a third party, and you're just claiming that you were ultimately liable for it. Here there was a direct loss because Travelers at all times was liable on the promissory notes, and the actions of the servicer resulted in a direct loss under the promissory notes because it's having to pay twice. Travelers is going to have to pay twice if they can pay because they're still liable for the full amount due to the Class A note holders under the note. So $1.4 million loss plus another $300,000, we allege, that improperly was paid. And that's a direct loss to Travelers because it's still liable for that amount under the promissory note. But in the Lynch case, it was a loss of funds in a bank account that a bank officer misapplied and misdirected. The bank never had an interest in those funds. It never had liability on those funds. I can understand all that, but could they have assigned anything more than Travelers' rights and Traveler waived their rights by not filing on time? Well, the issue is who has the right to bring a claim under the bond. If we have the right, I agree with you. Travelers did nothing here. Travelers did not take any steps under the bond. The issue is did BNY, as the indenture trustee, have the ability to take those steps on behalf of Travelers? Perhaps, but they had to be timely and they would have to have been within the time that Travelers could have brought them. And they were done within that time period, Your Honor. BNY gave notice of the loss within the time period required by the bond and brought suit within the two-year time frame required by the bond. And bought it in Travelers' name? No, in the name of the indenture trustee and on behalf of the Class A note holders. At this point, BNY really doesn't have any interest in the suiting longer because, as we've set forth, there was an actual sale of the collateral, which included the fidelity bond in this case, to the Class A note holders. That was going on when the court was hearing the summary judgment. And the briefing and the evidence was submitted in the form of an affidavit to the district court, letting the district court know that the sale had been noticed. That was in the supplemental briefing that was requested by the district court below. Even with the fact that that had been noticed, the district court entered summary judgment. And then after the summary judgment on the motion for a new trial, the sale occurred and the appellant submitted evidence that they had actually purchased the notes, appellants RBC, Dane Roscher, and Urfina Securities, that they had actually purchased the notes of that foreclosure sale. And that was the basis for the new trial. BNY was, of course, only a secured party at that point. Yes. So what was transferred to anybody else? You're claiming that their right to bring suit was transferred by their assignment of security interest? It was transferred by the foreclosure sale. Anytime a secured party has the right to foreclose on collateral and sell it, it can do so and transfer actual legal title. And that's what occurred in this case. The indenture itself, even apart from the UCC, also specifically allows BNY to sell any of the trust estate. It's under Section 6.03 of the indenture. And this was part of the trust estate as defined by the indenture. Was the indenture known to the insurance company at all? There's no evidence of that in the record, Your Honor. We believe that the fact that they issued these in connection with that transaction, they would clearly have to have been aware of it. The way this was submitted is we agreed upon stipulated facts because we believe that a lot of this, both sides agree that a lot of this were questions of law. So we agreed upon stipulated facts to avoid having to do extensive discovery before those issues of law were decided. There's still a lot out there that would have to be discovered through the discovery process. But I think both sides worked to expedite this and get these issues of law before the court. Unless there are any other questions, I'd like to save my remaining minute and a half for rebuttal. Certainly. All right. You may do that. Thank you. Mr. Reynolds. Thank you, Your Honor. We have the situation here where they admit, the appellant admits that at the time of the That was what the district court was faced with in evaluating this motion. Therefore, after they know they're going to lose, they then have this private sale, allegedly, between themselves of a bond they don't possess in violation of New York commercial law. And then they seek a new trial based upon that new fact. Well, that's not a new fact. That's a post-summary judgment fact that they create to try to remedy the clear defect they had at the time of the summary judgment and the defect they had at the time they file an action when they know they're not the real party in interest, not the insured, and had no standing to make claims under the bond. Now, counsel said there was two central issues, standing and direct loss. Those are two of the issues. I'll address those first. In terms of standing, the bond is issued to travelers, receivable, financial, whatever its name is. It's for the benefit of that entity alone. It says it on the face. BNY and the Class A note holders are nowhere mentioned in that bond. We as the insurance carrier issuing the bond are underwriting a specific risk. That risk is travelers receivable. And we're agreeing to provide fidelity coverage for that entity based upon the conduct of its employees. A stranger to the policy cannot later come in and say, because of the activities of a employee of a related corporation to the insured, we suffered a loss because we didn't get paid when we should have as Class A note holders. And therefore, we can recover our loss under this policy. Now, even if there was such a thing as being such a status as collateral assignee, even if that existed, which it doesn't, all the secured party would do, even if that was an assignment, they would step into the shoes of the insured. They don't get any rights to recover their own losses. They only would have a right to the proceeds of that policy covering the losses of the insured travelers. There's a very good reason travelers never asserted a claim here under this bond. They never had a loss. Consul's extenuated argument about loss is demonstrably shown to be untrue. Their allegation is some employee at Trace, the servicer, didn't advise us to certain financial conditions of Trace, and therefore, the net worth of Trace was thought to be higher than it was really. And this was a trigger mechanism in the servicing agreement related to the payment of Class A note holders or Class B note holders. All right. Travelers was the obligor under these notes. Travelers had an obligation to pay the Class A note holders and the Class B note holders regardless. It was just a matter of timing. It was a matter of who got paid first. There is no evidence in this record at all that travelers ever suffered a loss. It paid what it was obligated to pay under these notes. And there's really no evidence in the record that the appellants suffered a loss. It's just a matter of timing. When were they supposed to be paid? They have notes that are secured by mortgages on real estate throughout, I think most of this was in California. Now, we all know what happened to California real estate prices over the last few years. I can't believe if this ever went back and we got into discovery and everything else that they could ever show that they had a true loss other than possible timing of when they got their money. So anyway, that's not Travelers' loss and Travelers is the only insured. Oh, and by the way, the counsel mentioned Rider 2 to try to bootstrap Trace into coverage. I think he said that therefore Trace was also an insured. Not true. Look at Rider 2. It's 52 of the evidence compendium. That Rider merely makes the servicer an employee in essence of Travelers under certain conditions for certain losses. In other words, if Travelers suffers a loss resulting from an employee of the servicer committing a dishonest act with manifest intent to harm Travelers with respect to money, not paying money back upstream to Travelers because that's what the servicer does, collects on the mortgage loans from the consumers and pays back to Travelers. Under that limited situation, Travelers could have coverage for the dishonest acts of the servicer. Trace doesn't have anything to do with the allegations of dishonesty made in this case about somebody at Trace not recording certain events so that net worth didn't have anything to do with that. So Rider 2 is not applicable. The coverage here is limited to dishonest acts committed by the employees of Travelers. There's not one bit. I own a Trace. They claim it's Trace that did this bad act. The bond we issue only covers the employees of Travelers. So there's not one iota of evidence in the record that anybody at Travelers did anything wrong at any point in time, which goes back to his second point, the direct loss issue. He's trying to claim that Travelers suffered a direct loss because sometime in the future it might have to pay the Class A note holders again. I think that's what his argument was. That's not true. The note provides, the Class A note holders have to be paid. It's just when they have to be paid. The Class A note holders will not suffer loss under notes secured by real property. Beyond that, it's not a direct loss. It's clearly not a direct loss. In Vons, in that situation at least, the Vons was sued by these parties that got harmed, these third parties, and settled with the third parties before it made a claim under the fidelity bond. Of course, it has to be a direct loss suffered by the insured. We don't turn fidelity policies into liability policies. Your employee embezzled your money, a direct loss. Here, it's even more extenuated than in the Vons situation because there hasn't been a claim made against Travelers. Travelers hasn't been sued by anybody. Travelers hasn't paid any money to anybody. They're trying to claim that given that possible future liability, they can claim as the collateral assignee of this bond that Travelers has a direct loss. Well, not true. Not even close to being true. Mr. Taylor made a statement, I believe, about the state of the law in California as to assignments of insurance policies or provisions that negative anti-assignment provisions, I believe. Well, I'm not sure whether this is relevant or not, but tell me what's your interpretation of it? Well, I think under California law, which doesn't apply here, by the way, because the New York law was chosen in the contract, but under California laws, liability policies can be assigned, all right, and for purposes of obtaining the proceeds by the assignee, but it still doesn't make the assignee the insured under the policy. It's still an assignment to obtain proceeds. Fidelity bonds, I've seen no law that would allow such an assignment, and I think that's because it's a personal contract. It's dealing with the dishonesty of an insured's employees and a direct loss to the insured. It's not a coverage for liability. Is the rule the same in New York as the one you were just discussing with Judge Cudahy? Well, you know, I don't know because that issue is really not a central issue at any time, so I never researched that, but in terms of New York law, as cited in our brief, Your Honor, insurance policies cannot be used as collateral. For the obvious reason that they're between the insured and a stranger should not be involved in that proceeding. Counselor? Yes. Are we applying the law of the form, or was New York law planned at the lower court? New York law, they took the position that New York law applied to the indenture agreement, which included the collateral language about the bond. And that was planned at the district court level, so? Yes, and that was, and we didn't dispute that. We, you know, that's because that's what the indenture agreement says. So that's what we should be doing, too. Right. And if you look at the brief, in terms of New York commercial law, this after the fact sale between BNY and RBC is wrong and improper on numerous grounds. First, to sell a chattel, you have to have the chattel, and, which they didn't. They didn't have the bond. Travelers had the bond. More importantly, you can't, the reason to foreclose on a security interest, you're required to take steps to protect not only the creditor's  You can't sell such a security in a private sale unless the security is something openly traded on a market, such as stocks, certificates, something like that. Therefore, you know what the price is. If it's not that situation, you have to do a public sale. You have to give notice. You have to give the opportunity for the debtor to bid, other people to bid to make sure you get the best price. None of this was followed. There's five or six problems with this alleged private foreclosure sale that violate New York commercial law. And if you look at the reply, once we pointed out in opposition, they said, oh, well, maybe New York commercial law doesn't apply. But we had a right for a private sale under the agreement and the contracts of contract. I disagree. That was not the state of the record below, and it shouldn't be the state of the record here. Unless you have any questions. I don't believe that we do. Thank you. Taylor, you have a little bit of time remaining. First of all, the New York commercial law applies to the terms of indenture. California law applies to the right of a party to sue on the fidelity bond. In this case, that's not been disputed by anyone at any level in this case. Secondly, Your Honor, I find it odd that the account debtor type party that we're talking about here, essentially the fidelity bonding company, is complaining about a sale. The best way I can analogize it is this. If a secured party forecloses its lien on accounts receivable and sells those accounts receivable, the debtor to that secured party could complain about the sale. The account debtors, whose accounts were sold, can't complain that they don't owe the money to the person that bought the accounts receivable anymore. And that's what National Union wants you to believe here, that even if the sale was conducted improperly, and for the reasons set forth in our reply board, if we don't think it was done improperly, then they can't complain that they don't owe anything under the bond. That's an argument a debtor can make, not an account debtor can make, once the collateral is sold. Your Honor, the argument that the UCC doesn't apply to the sale, what the UCC says is it's not applicable to the assignment of an interest in an insurance policy. All that means is that the UCC doesn't apply. It doesn't mean that a transfer, a collateral assignment, isn't effective, and it doesn't mean that a party can't contract, as here, for the right for those proceeds and that collateral to be foreclosed upon and sold, and that's what occurred in this case. And unless there are any other questions, my time's up. Thank you very much. Thank you. We appreciate the arguments of both parties. The case just argued is submitted.
judges: B. Fletcher, Cudahy , Graber